# The Legislative Veto and Congressional Review of Agency Rules

[The following testimony discusses the constitutional objections to legislative vetoes, which are grounded in principles of presentation, bicameralism, and separation of powers. The testimony also describes and responds to several theories advanced in support of the constitutionality of legislative vetoes. Finally, it outlines the Reagan Administration's policy objections to legislative vetoes in the broader context of congressional review of agency actions, and suggests alternative ways in which Congress may provide meaningful legislative oversight of executive action consistent with applicable constitutional principles.]

October 7, 1981

## STATEMENT OF THEODORE B. OLSON, ASSISTANT ATTORNEY GENERAL, OFFICE OF LEGAL COUNSEL, BEFORE THE SUBCOMMITTEE ON RULES OF THE COMMITTEE ON RULES, UNITED STATES HOUSE OF REPRESENTATIVES

### Introduction

Thank you for affording me the opportunity to appear before you today to discuss congressional review of agency rules and, in particular, legislative vetoes.

I hasten to acknowledge that there may be little that I can add to this Subcommittee's wisdom in this field. This Subcommittee performed a valuable service during the 96th Congress by holding extensive hearings on this topic. I may not be able to expand upon the wealth of material contained in the several volumes published on this subject by this Subcommittee last Congress.

I should note at the outset that I supplied testimony in this area last April to the Subcommittee on Agency Administration of the Committee on the Judiciary of the United States Senate. Rather than take your time with a repetition of the views expressed on that occasion, I am furnishing your Subcommittee with a copy of that testimony and ask that it be included as part of the record of today's hearing.

In my remarks today, I will expand upon this Administration's constitutional objections to legislative vetoes and discuss briefly the broader subject of congressional review of agency rules. Consideration of alternative methods of congressional review of agency actions, including

294

rules, should not be deterred by concentration exclusively on the legislative veto. There are numerous techniques that may better serve the objectives of restraining and preventing agency or administrative abuses without deviating from fundamental constitutional requirements concerning the procedures by which Congress may legislate and the principle of the separation of powers.

As a preliminary matter, I would like to address two points. First, my testimony represents the position of the Administration concerning the constitutionality of legislative veto provisions. As a matter of policy, however, and as I will discuss in more detail later in my testimony, the Administration is not opposed to all congressional oversight devices. Without in any way diminishing its responsibility to challenge the constitutionality of such matters in the courts, in the legislative process the Administration may not necessarily oppose certain legislative oversight measures relative to selected "independent" agencies. The President might well decide to sign a bill containing such a proposal; indeed, every modern President has signed similar laws in the past. However, the Administration would be compelled to oppose any legislative veto provision that applied to Executive Branch agencies under the direct supervision and control of the President.

Second, I would like to address the notion, mistaken in my view, that legislative vetoes present "liberal-conservative" issues. Characterization in this manner tends to confuse the debate, divert attention from the real concerns, and utterly misconstrue the nature of the relevent legal and policy considerations.

Legislative vetoes implicate two general areas of constitutional concern: (1) how laws are created and (2) how the power to execute laws is allocated under our Constitution. It is neither accurate nor illuminating to characterize concern for the principles that laws may only be created by the affirmative votes of both Houses of Congress and the concurrence of the President or a congressional override of his veto as "liberal" or "conservative." Moreover, the elaboration of constraints placed by the principle of separation of powers on the Executive or Legislative Branches is not, and in rational terms *cannot,* be analyzed in terms of considerations that usually are viewed as "conservative" or "liberal." Neither end of the political spectrum has an exclusive claim to the conviction that the executive power is vested by the Constitution in the President.

There is obviously a great deal more than partisanship involved in opposition to a technique by Presidents ranging from Roosevelt, Truman, Kennedy, and Johnson to Hoover, Eisenhower, Nixon, and Ford. I do not believe that either "liberal" *or* "conservative" leanings prompted one of my predecessors, then Assistant Attorney General, now Supreme Court Justice William Rehnquist, to refer to legislative

vetoes as "clearly . . . a violation of the separation of powers."[1] The same may be said of a 1977 American Enterprise Institute-sponsored study which stated that the legislative veto device "is, almost necessarily, unconstitutional."[2]

Partisan labeling of this issue simply does not promote analysis or understanding. The issue must be approached and addressed from the dual standpoints of how a particular legislative veto might rearrange the manner in which laws are created—either without participation by the President or without both the President and some portion of the Congress—and the extent to which a particular form of legislative veto might revise the President's constitutional responsibility to enforce and administer the laws that Congress enacts.

With this background in mind, I would like to turn to an analysis of the constitutionality of legislative vetoes.

## I. The Legislative Veto

Because the term "legislative veto" has been used to describe a wide range of congressional oversight techniques, it is analytically useful to provide a definition of the term. It is a statutory provision under which Congress, or a unit of Congress, is purportedly authorized to adopt a resolution that will impose on the Executive Branch a specific requirement to take or refrain from taking an action. A key characteristic of all legislative veto provisions is that a resolution pursuant to such a provision is not presented to the President for his approval or veto. Such a provision contemplates a procedure under which one or both Houses of Congress or a committee of one House may act contrary to the constitutional procedure for enacting laws to overrule, reverse, revise, modify, suspend, prevent, or delay an action by the President or some other part of the Executive Branch.

The two-House legislative veto consists of both Houses acting affirmatively by concurrent resolution (as in the case of motor vehicle safety standards, 15 U.S.C. § 1410(d) (1976)). A variation is the active involvement by one House of Congress and the passive acquiescence or failure to disagree by the other House—which is termed a "one-and-one-half House" legislative veto (as in S. 890, 97th Cong., 1st Sess. (1981), the proposed Regulatory Reduction and Congressional Control Act of 1981). A legislative veto provision may provide for a veto by one House of Congress (as in the Federal Pay Comparability Act of 1970, 5 U.S.C. § 5305(c)(2) (1976), or in the Congressional Budget and Impoundment Control Act of 1974, 31 U.S.C. § 1403(b) (1976)), or by one committee of one House of Congress (as in the case of the Federal

---

[1] Address by William H. Rehnquist, "Committee Veto: Fifty Years of Sparring Between the Executive and Legislature" 9–10 (Aug. 12, 1969) (Speech before the Section on Administrative Law of the American Bar Association)

[2] J. Bolton, The Legislative Veto: Unseparating the Powers 49 (1977).

Land Policy and Management Act of (1976), 43 U.S.C. § 1714(e) (1976)). Legislative veto provisions are contained in statutes dealing with rulemaking by Executive Branch departments and agencies (for instance, rulemaking by the Department of Education, 20 U.S.C. § 1232(d) (1976 & Supp. IV 1980)), as well as with rulemaking by "independent" agencies and commissions (for instance, rulemaking by the Federal Trade Commission, in view of § 20 of the Federal Trade Commission Improvements Act of 1980, 15 U.S.C. § 57a-1 (Supp. IV 1980)). They also are contained in legislation under which Executive Branch officials are called upon to execute the law in particular cases—for instance, when the Attorney General suspends the deportation of an alien, 8 U.S.C. § 1254 (1976 & Supp. IV), when the President approves execution of an agreement with another nation for atomic energy co-operation, 42 U.S.C. § 2153(d) (Supp. IV 1980), or when the National Railroad Passenger Corporation seeks to alter Amtrak's basic route system, 45 U.S.C. § 564(c) (1976 & Supp. IV 1980).

## A. Constitutional Defects

For purposes of constitutional analysis, all of the types of legislative vetoes that I have outlined share two substantial infirmities. First, because they do not provide for presentation to the President of a resolution purporting to bind the Executive Branch, they violate the constitutionally mandated procedures for legislative action set forth in the Presentation Clauses of Article I, § 7, clauses 2 and 3. A related defect of legislative veto provisions other than two-House vetoes is that they violate the constitutional principle of bicameralism, under which all exercises of the legislative power having binding effect on the Executive Branch must first involve passage of a resolution or bill by both Houses of Congress—not just one House or one committee—before presentation to the President. This is also a requirement of Article I, § 7, clauses 2 and 3.

Second, since legislative vetoes would allow the Legislative Branch (or some unit of it) to substitute its judgment about how best to execute the law for the discretion of the Executive Branch, legislative veto provisions violate the underlying constitutional principle of the separation of powers, under which the Legislature is to legislate and the Executive is to execute the law.

I will discuss these constitutional defects in turn.

## 1. Article I, § 7

### (a) The Presentation Clauses

A resolution adopted pursuant to a legislative veto provision is necessarily an exercise of Congress' Article I power to take legislative action. Article I is the source of Congress' power to impose legal requirements on the Executive Branch. As noted earlier, while some

forms of legislative vetoes apply to purely executive actions, Congress simply may not execute the law. That power is given to the President. Article II, § 1, clause 1 states that executive power "shall be vested in [the] President." With certain express exceptions (*e.g.,* the Senate's advice and consent regarding presidential appointments), when Congress acts, it is exercising its legislative powers.

However, the Constitution did not leave it to the discretion of Congress to decide *how* it will exercise its legislative power. Specific procedures must be followed as prescribed in Article I, § 7, clauses 2 and 3. Article I, § 7, clause 2 provides that every "bill" "before it become[s] a Law" shall have been passed by both Houses of Congress and shall have been presented to the President for his approval or veto. If the President disapproves of a "bill" and vetoes it, the bill may still become law if it is re-passed by a two-thirds vote of both Houses of Congress.

The Framers anticipated and closed the "loophole" that might have been thought to exist under clause 2 which might, standing alone, have been perceived to have allowed Congress to avoid the presentation requirement by legislating in the form of resolutions rather than "bills." They added to the text of the Constitution Article I, § 7, clause 3, which provides in language that in many respects tracks clause 2, that "[e]very Order, Resolution, or Vote" requiring concurrent action (except resolutions of adjournment) [3] "shall be presented to the President," who may approve or veto the order, resolution, or vote. Like clause 2, clause 3 provides that after a proposal is vetoed, it may still become law if it is subsequently passed by a two-thirds vote of both Houses of Congress. Thus, clause 3, read in conjunction with clause 2, makes quite plain that the Framers intended that all exercises of legislative power having the substantive effects of legislation, irrespective of the form of congressional action, must follow the specified legislative procedure. [4]

Clauses 2 and 3 demonstrate that the Framers intended that all exercises of legislative power must follow the required process, which includes *passage* by both Houses of Congress and then *presentation* to

---

[3] Article I, § 5, clause 4 prevents adjournment for more than 3 days without the consent of each House. Because such adjournments thus must be accomplished by concurrent action, a specific proviso in Article I, § 7, clause 3 was necessary to prevent Congress from having to submit adjournment resolutions to the President. It would be inappropriate for Congress to have to present adjournment resolutions to the President for his approval or veto since the President is able to convene Congress in any event. *See* Article II, § 3; S. Rep. No. 1335, 54th Cong., 2d Sess. 6 (1897).

[4] The history of the adoption of clauses 2 and 3 confirms that conclusion. During the debate on the presidential veto provision, James Madison observed that

> if the negative of the President was confined to *bills.* it would be evaded by acts under the form and name of resolutions, votes [etc. He] proposed that "or resolve" should be added after "*bill,*" . . . with an exception as to votes of adjournment [etc.]. (*Emphasis in original.*)

5 J. Elliot, Debates on the Adoption of the Federal Constitution, 431 (1876). Although Madison's proposal was initially rejected, it was renewed during the following day's session by Mr. Randolph, who put the proposal in a new form substantially as it now appears. It was then adopted by a 9 - 1 vote. 2 M. Farrand, Records of the Federal Convention of 1787, 304–08 (rev. ed. 1937).

the President.[5] As one commentator noted, "[i]t would be difficult to conceive of language and history which would more clearly require that all concurrent action of the two Houses be subject to the President's approval or veto."[6] Legislative veto provisions fall short of compliance with these requirements in that they do not permit the President to exercise his power to approve or veto a legislative veto resolution.

The presentation requirement is critical to our constitutional scheme of government. The separation of powers that distinguishes our Constitution is counter-weighted with a system of checks by each branch over the other two. The President's power to approve or veto actions of Congress is absolutely necessary to the preservation of the Presidency and to the system of checks and balances. *See* The Federalist, Nos. 48 & 73 (J. Madison & A. Hamilton) (J. Cooke ed. 1961); 2 M. Farrand, Records of the Federal Convention of 1787, 299–300, 586–87 (rev. ed. 1937). The Constitution's Framers feared that, absent a presidential veto, "the legislative and executive powers might speedily come to be blended in the same hands." The Federalist No. 73, at 494 (A. Hamilton) (J. Cooke ed. 1961). The Framers also believed that the President's veto power could operate on behalf of the public interest to protect against the effects of special interests in our public life. *See* The Federalist No. 73, *supra*. Without the veto power, as Alexander Hamilton observed, the President "would be absolutely unable to defend himself against the depredations of the [Legislative Branch]. He might gradually be stripped of his authorities by successive resolutions or annihilated by a single vote."[7]

Legislative veto provisions purport to authorize congressional resolutions that change the law without being subject to the presidential veto. They circumvent one of the President's most important constitutional powers—in a sense, his only defense. They are therefore not constitutionally permissible.

---

[5] Exercises of legislative power having the substantive effect of legislation and subject to the procedures of Article I, § 7 are distinguishable from: (1) acts that may be taken by one or both Houses of Congress or their committees because they are merely in aid of Congress' legislative power and do not purport to bind the Executive Branch, such as investigations, oversight hearings, or requests for information from the Executive Branch, and (2) acts by one or both Houses of Congress expressly authorized by a constitutional provision that does not require the procedures in Article I, § 7. The latter class of actions includes the power of the House of Representatives to impeach (Article I, § 2, clause 5); the Senate's power to try all impeachments (Article I, § 3, clause 6) and to ratify treaties and pass upon presidential nominations (Article II, § 2, clause 2), the power of both Houses to pass a concurrent resolution of adjournment that is not presented to the President (Article I, § 7, clause 3), and the power of each House to establish rules governing its own proceedings (Article I, § 5, clause 2) *See also* Article V and *Hollingsworth* v *Virginia*, 3 U S. (3 Dall.) 378 (1798) (power of both Houses by a two-thirds vote to propose constitutional amendments) In addition, of course, one or both Houses of Congress can employ a resolution as a means of expressing an opinion of the House that purports to have no binding effect on the Executive Branch.

[6] Ginnane, *The Control of Federal Administration by Congressional Resolutions and Committees,* 66 Harv L. Rev. 569, 573 (1953).

[7] The Federalist No. 73, at 494 (A. Hamilton) (J. Cooke ed. 1961).

The argument that legislative veto provisions directed at agency rules do not contemplate the exercise of legislative power does not survive a straightforward analysis. Typically, Congress delegates rulemaking authority to an agency to implement policy objectives mandated by statute. Agency regulations adopted pursuant to such an authorization have the force and effect of law if they are within the substantive delegation of the rulemaking power. *See, e.g., Chrysler Corp.* v. *Brown,* 441 U.S. 281, 295-96 (1979). Such a statutory delegation, which requires the concurrence of both Houses of Congress and presentation to the President, may be withdrawn or modified only by following the same procedure for legislation. In contrast, a legislative veto provision would erect a fundamentally different scheme. It would allow Congress—whether two Houses, one House, or otherwise—to overrule or block a rule or decision by the Executive Branch that had been issued pursuant to statutory authorization. The effect would amount to repealing or partially modifying the prior statutory authorization without following the prescribed process of presenting to the President resolutions having a public, legally binding effect.[8] Hence, the resolutions constitute legislative actions and, to be constitutional, they must be presented to the President for his concurrence or veto.

(b) The Bicameralism Principle

Legislative vetoes that contemplate action by Congress without affirmative approval by *both* Houses of Congress also violate the Constitution's bicameralism principle. This principle, like the presentation requirement, is embodied in Article I, § 7, clauses 2 and 3. These two clauses, which I have already discussed, require that any measure that has the effect of an exercise of legislative power, whether in the form of a bill, resolution, or otherwise, must be affirmatively *approved by both Houses of Congress.*[9] This conclusion is buttressed by the language of Article I, § 1, which vests "[a]ll legislative Powers herein granted" in "a Congress of the United States, which shall consist of a Senate *and* House of Representatives" (emphasis added).

---

[8] Because under most forms of legislative veto devices, such rules go into effect (subject to judicial review) without any further action by Congress, it cannot plausibly be argued that such rules constitute mere "proposals" or "recommendations," the veto of which does not affect the legal "status quo."

[9] *See* S. Rep. No. 1335, 54th Cong., 2d Sess. 1-2, 6-8 (1897). Any suggestion that by assigning "veto" power to one House, rather than both, Congress may avoid the strictures of Article I, § 7, clause 3 would appear to be a constitutional absurdity. *See* Watson, *Congress Steps Out: A Look at Congressional Control of the Executive,* 63, Calif. L. Rev. 983, 1066 n.428 (1975) (it "verges on irrationality to maintain that action by concurrent resolution, whereby Congress is at least held in check by its own structure, is invalid because the veto clause so states, but that the invalidity of a simple resolution, wherein a single House acts without check, is more in doubt"). As another commentator put it: "It surely must be true that a power not permitted to both houses of Congress by the Constitution cannot suddenly be made available by delegating it to one house." J. Bolton, The Legislative Veto: Unseparating the Powers, 39 (1977).

The bicameralism principle of Article I, § 7 contemplates actual *passage* of a resolution by both Houses—not mere passive "acquiescence" by one of the two Houses with respect to the action of the other House. Legislative veto provisions that contravene this bicameralism principle are invalid for that reason alone.

## 2. The Principle of the Separation of Powers

The additional constitutional defect of legislative veto provisions is that, to the extent that they permit Congress to reserve to itself powers vested by the Constitution in the Executive and Judicial Branches, they violate the principle of the separation of powers. This principle, one of the two or three most fundamental premises that underlie our Constitution, is directly reflected in the Constitution's structure, which establishes the three branches of government in Articles I, II, and III, for the purposes of legislating, executing the laws, and adjudicating, respectively. It also is reflected in several other provisions, including Article I, § 7, clauses 2 and 3 (the Presentation Clauses); Article I, § 6, clause 2 (the Ineligibility and Incompatibility Clause); and Article II, § 2, clause 2 (the Appointments Clause). *See generally Buckley* v. *Valeo,* 424 U.S. 1, 120–37 (1976).

The principle of the separation of powers is based on the premise that if one branch of government could, on its own initiative, merge legislative, executive, or judicial powers, it could easily become dominant and tyrannical. In such a circumstance, it would not be subject to the checks on governmental power that the Framers considered a necessary protection of freedom. *See* The Federalist Nos. 47 & 73 (J. Madison & A. Hamilton) (J. Cooke ed. 1961). The three branches of government are not "watertight compartments" acting in isolation of each other. *Springer* v. *Government of the Philippine Islands,* 277 U.S. 189, 211 (1928) (Holmes, J., dissenting); *see Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579, 635 (1952) (Jackson, J., concurring). Rather, the Framers conceived of national government as involving the dynamic interaction between the three branches, with each "checking" the others and "balancing" the powers conferred on the others with its own assertions of power. At the core of this concept is the precept that no single branch can usurp or arrogate to itself the essential functions of the other branches.

The Framers realized that "[i]n republican government, the legislative authority, necessarily, predominates." The Federalist No. 51, at 350 (J. Madison) (J. Cooke ed. 1961). One of their major concerns was to ensure that this most powerful branch of government did not become too powerful. "[I]t is against the enterprising ambition of this department, that the people ought to indulge all their jealousy and exhaust all their precautions." The Federalist No. 48, at 334 (J. Madison) (J. Cooke ed. 1961). The Framers knew, as Blackstone had observed, that "[i]n all

tyrannical governments, the supreme magistracy, or the right both of *making* and *enforcing* the laws, is vested in one and the same man, or one and the same body of men." 1 W. Blackstone, Commentaries 146 (Cooley 4th ed., 1899) (emphasis in original). Madison observed that the accumulation of legislative, executive, and judicial power in one department was "the very definition of tyranny." The Federalist No. 47, at 324 (J. Madison) (J. Cooke ed. 1961). He cited Montesquieu for the proposition that " 'there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates.' " *Id.* at 325. Precisely in order to prevent such an accumulation of power, the Constitution was structured so that "[t]he magistrate in whom the *whole* executive power resides cannot of himself make a law, though he can put a negative on *every* law" and "[t]he entire legislature . . . can exercise *no* executive prerogative. . . ." *Id.* at 326 (emphasis added).

The boundary between legislative and executive action is set in the first instance by Congress when it decides how much discretion to delegate to the Executive Branch in implementing policies established by statute. Once such an authorization is enacted, however, the implementation of the statutory policies is an executive function. Indeed, it is the *core* of the Executive Branch's function. The statute sets a boundary beyond which the Executive Branch may not go without intruding on the legislative function. It similarly sets a boundary within which the Executive must be allowed to function without congressional vetoes or requirements except as adopted through the constitutional process of legislation. If it were otherwise, Congress would be able to arrogate to itself the essence of the Executive's function. In that circumstance, there would be no place for the Executive as a separate, co-equal branch of government.

This principle is violated by legislative veto provisions to the extent that they would give to the Houses of Congress or even committees of Congress the power to intervene, apart from the passage of legislation, directly in the process by which the Executive Branch executes the law in particular cases or by rulemaking. They would effectively transform executive decisions into tentative actions, rather like those of congressional committees, having no force and effect of their own but merely achieving legal status if Congress, for example, does not disapprove them. In essence, a legislative veto of agency rules would set up the Houses of Congress as final *administrative* authorities over the whole range of regulatory matters. Legislative vetoes of purely executive decisions take the power from the Executive Branch and vest it in the Congress just as surely as if the President were simply an advisory official, suggesting proposed actions to Congress. This system might be what some may prefer, but it is not the system that our Constitution created.

It must be conceded that there have been abuses of power by Executive Branch agencies. Congress is properly disturbed when an agency exceeds the limits on its discretion or ignores the manifest will of the Legislature. But in our system, the Judiciary, not Congress, corrects such abuses absent the adoption of plenary legislation. As members of this Subcommittee repeatedly have observed, it is your right and your responsibility to set policies and to insist that the policies you established will be implemented. However, as Justice Brandeis noted, the doctrine of the separation of powers was adopted ". . . not to promote efficiency but to preclude the exercise of arbitrary power . . . not to avoid friction, but . . . to save the people from autocracy." *Myers* v. *United States,* 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting).

## B. Responses to Proponents of Legislative Vetoes

I would like to respond briefly to the major rejoinders by those who support legislative veto provisions and believe that they are not unconstitutional.

First, although some argue otherwise, there is no meaningful constitutional distinction to be drawn between legislative vetoes of rulemaking and of other types of agency action. Rulemaking is a form of executive action. *See Buckley* v. *Valeo,* 424 U.S. at 140–41. Like other such actions, it is lodged in the Executive Branch under Article II of the Constitution. The distinction between rulemaking and other forms of executive action carries no weight with respect to compliance with the constitutionally prescribed procedure for the exercise of legislative power. Article I, § 7, clauses 2 and 3 specify the process to be followed by *all* legislative action having the force of law and not otherwise covered by constitutional sections specifically providing for a different procedure, regardless whether the action affects rulemaking, adjudication, or other decisions by agencies.

Second, it has been argued that the adoption of a resolution disapproving an agency rule pursuant to a legislative veto provision is not really an exercise of legislative power and is not therefore subject to the constitutional provisions that I have described, but rather is the exercise of a condition on agency discretion under a statute giving the agency rulemaking power in the first place. Viewed in that light, original grants of rulemaking discretion to agencies in organic statutes would be changed by amendments containing legislative veto provisions to "conditional delegations." The analogy is to grants of statutory power made contingent upon findings of fact by an Executive Branch officer, or upon the favorable vote of persons who will be affected by proposed governmental action. *See* H.R. Rep. No. 120, 76th Cong., 1st Sess. 6 (1939). Such an argument is, in the first instance, semantic in that it presupposes that affixing another label to the final act of the legislative body which determines what the law will or will not be can

303

render it not an exercise of legislative power. That supposition simply exalts the label over the reality of what is occurring. Moreover, the fatal analytical deficiency in this argument is that it assumes that the delegation of power to a person or entity outside the Legislative Branch is constitutionally equivalent to the delegation of power to the Houses of Congress, which are within the Legislative Branch and thus subject to the strictures of Article I. That assumption is insupportable. The Framers of our Constitution did not want Congress to have the power that they gave to the Executive. Whenever power is vested outside Congress, it is not concentrated within it. The undue concentration of power *in* Congress is what the separation of powers is specifically designed to avoid. Hence, a provision allowing persons or bodies outside Congress to determine whether conditions on the exercise of delegated authority have been met does not present the same constitutional separation of power questions that vesting such power within Congress raises.

The other deficiency in the "conditional delegation" argument is that if carried to its obvious and natural extreme, it would allow a single member of Congress to be authorized to veto any or every executive action—an obvious absurdity.

Third, it is no response to the constitutional objections to legislative vetoes to assert that they are authorized by the Necessary and Proper Clause, Article I, § 8, clause 18, which grants Congress power to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing [enumerated] Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." The exercise of Article I power by Congress pursuant to the Necessary and Proper Clause is limited by other express provisions of the Constitution, including Article I, § 7, clauses 2 and 3 and by the principle of the separation of powers. *See Buckley* v. *Valeo,* 424 U.S. at 135. As the United States Court of Appeals for the Ninth Circuit noted in *Chadha* v. *INS,* 634 F.2d 408, 433 (1980), petition for cert. pending No. 80–1832 (filed May 1, 1981), the Necessary and Proper Clause "authorizes Congress to 'make all laws,' not to exercise power in any way it deems convenient. That a power is clearly committed to Congress does not sustain an unconstitutional form in the exercise of the power."

## C. Policy Objections

In addition to their serious constitutional defects, legislative vetoes are objectionable for a variety of other reasons. First, they do nothing to cure the root causes of regulatory excesses, duplication, or inefficiency, namely, broad, relatively standardless delegations to agencies. In fact, they have a natural tendency to encourage broader statutory delegations, for they provide the superficial reassurance that Congress

may have a role in implementing a statute after it is passed and thus need not carefully define an agency's powers and limits before the law is enacted. The result of overbroad delegation is excessive agency discretion that could not possibly be monitored carefully by Congress.

Legislative vetoes also have been said measurably to increase the amount of behind-the-scenes negotiation between agencies and committee staffs and single members of Congress to the detriment of a public, fully accountable administrative process.[10] In addition, many veto provisions foster delay, for even though only few rules or actions would likely be vetoed, all matters referred to Congress would be subject to deferral and uncertainty.

To the extent that legislative vetoes may be passed by less than two Houses of Congress, they undermine the accountability of all members of Congress for actions of Congress. They thus encourage the tendency of decentralization of power within Congress to the detriment of the body as a whole. Furthermore, to the extent that Congress as a body does get seriously involved in reviewing rules or other executive actions subject to legislative vetoes, Congress predictably will get hopelessly mired in details. As Jefferson wrote:

> Nothing is so embarrassing nor so mischievous, in a great assembly, as the details of execution. The smallest trifle of that kind occupies as long as the most important act of legislation, and takes place of everything else. Let any man recollect, or look over, the files of Congress; he will observe the most important propositions hanging over, from week to week, and month to month, till the occasions have passed them, and the things never done. I have ever viewed the executive details as the greatest cause of evil to us, because they in fact place us as if we had no federal head, by diverting the attention of that head from great to small subjects . . . .[11]

In short, legislative vetoes do not solve the problems of administrative excess that they are intended to correct, and they have several policy infirmities of their own.

## II. Congressional Review of Agency Action in General

Although the Administration believes that legislative veto provisions are unconstitutional and is taking that position in pending litigation,[12]

---

[10] *See* Bruff and Gellhorn, *Congressional Control of Administrative Regulation: A Study of Legislative Vetoes,* 90 Harv. L. Rev. 1369, 1409–14 (1977).

[11] 6 T. Jefferson, The Writings of Thomas Jefferson 228 (A. Bergh ed. 1903) (letter to E. Carrington, Aug. 4, 1787).

[12] Among the pending cases are *Immigration and Naturalization Service* v. *Chadha,* petition for cert. pending No. 80–1832 (filed May 1, 1981), in which the Department of Justice has filed a Jurisdictional Statement in the Supreme Court on behalf of the Immigration and Naturalization Service; *Consumer*
Continued

305

we would stress that there are many full constitutional legislative and oversight mechanisms that Congress can use to achieve the goals of more effective review of executive action, including rules. In organic statutes, Congress can—and undoubtedly should—place specific and precise limits on the authority of agencies to issue rules. Moreover, Congress always can override unwise, inappropriate, burdensome, or excessive agency rules with legislation. To the extent that procedural hurdles within Congress impeding the enactment of legislation have fostered legislative veto proposals, Congress can adopt legislation assuring early floor consideration of bills overturning agency rules.

Congress also can authorize an agency to act for a limited period of time, thereby forcing the agency to return to Congress for authority to continue to act when its authorization expires. Congress can hold oversight hearings, at which explanations for agency rules that members of Congress may question can be sought and made part of a public record. Congress can adopt resolutions expressing its views that, while not legally binding upon the Executive Branch unless adopted pursuant to the plenary legislative process, can guide an agency in its implementation of the law. Further, Congress has authority to appropriate the money with which agencies execute the law. In appropriations statutes, Congress can provide for limitations on the expenditure of funds for certain purposes consistent with other applicable legal requirements.

Another alternative is one that I understand originated in this Subcommittee last year. It is the proposal to create a Select Committee on Regulatory Affairs that would be given broad jurisdiction over the rulemaking activities of the federal government. By virtue of its broad jurisdiction, such a committee could investigate issues of regulatory

*Energy Council of America* v *Federal Energy Regulatory Commission*, Nos. 80-2184, 80-2312, argued on September 10, 1981, before a panel of the United States Court of Appeals for the District of Columbia Circuit; and *Pacific Legal Foundation* v. *Watt*, No. 81-141, and *Mountain States Legal Foundation* v. *Watt*, No. 81-168, two cases consolidated in the United States District Court for the District of Montana.

The only federal court yet to reach the issue of the constitutionality of "legislative veto" devices other than the United States Court of Appeals for the Ninth Circuit in *Chadha* v. *INS*, 634 F.2d 408 (1980), is the United States Court of Claims in *Atkins* v. *United States*, 556 F.2d 1028 (Ct. Cl. 1977), *cert. denied* 434 U.S. 1009 (1978). The 4–3 holding of the Court of Claims in that case was narrowly restricted to the context of the Federal Salary Act of 1967, 2 U.S.C. § 359(1)(B)(1970). *See* 556 F.2d at 1059. Three of the seven judges forcefully disagreed with the *per curiam* opinion on the legislative veto device under consideration there. *Cf. Buckley* v. *Valeo*, 424 U.S. 1, 140 n.176 (1976) (declining to address the question of the validity of a one-House "legislative veto" provision in the Federal Election Campaign Act of 1971, 2 U.S.C. § 438(c) (Supp. IV 1980), an issue not briefed by the United States); 424 U.S. at 257 (White, J., concurring in part and dissenting in part) (concluding that the "legislative veto," at least as applied to so-called "independent agencies," is not a usurpation of the President's constitutional power); *McCorkle* v. *United States*, 559 F.2d 1258 (4th Cir. 1977), *cert. denied* 434 U.S. 1011 (1978) (declining to reach the issue of the constitutionality of the same provision of the Federal Salary Act that was at issue in *Atkins* v. *United States*, *supra*, on the ground that the provision was not "severable" from the rest of the statute and, therefore, even if the statute were held unconstitutional, plaintiff would have no right to additional pay); *Clark* v. *Valeo*, 559 F.2d 642 (D.C. Cir.) (*en banc*), *aff'd mem. sub nom. Clark* v. *Kimmitt*, 431 U.S. 950 (1977) (declining to consider the constitutionality of the "legislative veto" provision of the Federal Election Campaign Act on the ground that the issue was not ripe for adjudication), 559 F.2d at 678 (MacKinnon, J., dissenting) (concluding that the legislative veto provision is unconstitutional).

overlap and duplication that presently prove difficult for standing committees to address.

The common themes underlying these several alternative methods by which Congress actively can review agency rules is that they do not displace the President and the Executive Branch in the execution of the law. They respect the principle of the separation of powers, as well as the presentation and bicameralism principles that apply to exercises of legislative power.

There should be no doubt regarding this Administration's concern about excessive and abusive agency actions. Indeed, the Administration has taken numerous steps to assure that agency rules are carefully considered and limited in the manner provided by Congress. If further oversight is necessary, we would support the use of joint resolutions providing for consideration by both Houses of Congress, presentation to the President, and a congressional override of any presidential veto in the rare case in which it might occur. Such a method would include in the process all of the major elected officials in the national government. As you know, the President shares your concern that the costs and burdens of government must be diminished. Any mutual attempts to achieve this objective that do not strip the President of his constitutional power would be welcomed.

### Conclusion

We respect the views of those members of Congress who disagree with us on the constitutional questions and we join in their desire for a reasonably prompt resolution of this dispute in the courts. In the meantime, we urge restraint against proposals that tend to rearrange the powers which our forefathers so carefully distributed among the three branches.

The debate over legislative vetoes and alternative ways for Congress to oversee agency rules must be viewed in terms of the most basic structural underpinnings of our system of government—checks by the legislature upon itself; the principle of bicameralism; checks by the President on the Congress in the form of presentment of legislation to him for veto or approval; and the separation of powers between Congress and the Executive Branch. The temptation to vest greater power in Congress and to exercise greater control over the Executive Branch should not provide the excuse for a major structural rearrangement in violation of these principles.

Each branch seems inclined to rectify perceived abuses in the other two by expediencies that the Constitution will not tolerate. We must be ever mindful that the genius that created the precious system which has preserved our freedom for nearly 200 years expressly eschewed remedies for temporary problems that pave a path for excessive domination by one branch of government.